Eddie A. Pantiliat (State Bar No. 015231)
**HYMSON GOLDSTEIN & PANTILIAT, PLLC**
16427 N. Scottsdale Road, Suite 300
Scottsdale, Arizona 85254
Telephone: 480- 991-9077
minute@legalcounselors.com

Jason R. Mullis (State Bar No. 024289)
jmullis@wshblaw.com
**WOOD, SMITH, HENNING & BERMAN LLP**
2525 E. Camelback Road, Suite 450
Phoenix, Arizona 85016-4210
Phone: 602-441-1300 ♦ Fax 602-441-1350

*Attorneys for Two Fingers, LLC dba Stone and Vine Urban Italian Restaurant, Four Fingers, LLC dba Salt & Lime Modern Mexican Grill, Six Fingers, LLC dba Black & Bleu Restaurant, and Joseph M. Popo and Gabriella Popo*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| AMY PATTERSON,<br><br>Plaintiff,<br><br>v.<br><br>TWO FINGERS, LLC, an Arizona corporation dba Stone and Vine Urban Italian Restaurant; FOUR FINGERS, LLC, an Arizona corporation dba Salt & Lime Modern Mexican Grill; SIX FINGERS, LLC, an Arizona corporation dba Black & Bleu Restaurant; JOSEPH M. POPO and GABRIELLA POPO,<br><br>Defendants.<br><br>TWO FINGERS, LLC, an Arizona corporation dba Stone and Vine Urban Italian Restaurant; FOUR FINGERS, LLC, an Arizona corporation dba Salt & Lime Modern Mexican Grill; SIX FINGERS, LLC, an Arizona corporation dba Black & Bleu Restaurant; JOSEPH M. POPO and GABRIELLA POPO,<br><br>Counterclaimants, | Case No. 2:15-cv-00494-NVW<br><br>**DEFENDANTS TWO FINGERS, LLC'S, FOUR FINGERS, LLC'S, SIX FINGERS, LLC'S, AND JOSEPH M. POPO'S AND GABRIELLA POPO'S RESPONSE TO PLAINTIFF'S MOTION FOR ORDER PROHIBITING DEFENDANTS FROM (1) INTIMIDATING WITNESSES AND (2) THREATENING COUNSEL**<br><br>The Hon. Neil V. Wake |

LEGAL:10453-0075/4476948.1

|   |   |
|---|---|
| v. | |
| AMY PATTERSON, PETER K. STROJNIK and THE STROJNIK FIRM L.L.C., an Arizona limited liability company, | |
| Counterdefendants. | |

Defendants Two Fingers, LLC, Four Fingers, LLC, Six Fingers, LLC and Joseph M. Popo (collectively, "Defendants"), by and through undersigned counsel, hereby Respond to Plaintiff's Motion for Order Prohibiting Defendants From: (1) Intimidating Witnesses; and (2) Threatening Counsel ("Plaintiff's Motion" or "Document 30"). Plaintiff's Motion is a calculated effort to distract the Court's attention from Defendants' allegations of impropriety with the hope of obtaining authority to reopen the defamatory website and participate in *ex parte* communications with both current and former employees. Plaintiff's brazen request for authority in light of the prior instances of impropriety underscore the lack of deterrent effect and necessity for continued restrictions.

As detailed herein, Plaintiff's request for *ex parte* communications is overbroad, encompassing categories of current and former employees prohibited by Arizona Ethical Rule 4.2. Defendants respectfully request that Plaintiffs be prohibited from engaging in ex parte communications with current and former employees with managerial responsibilities. For other categories of employees, Defendants respectfully request that Plaintiff's counsel be required to provide a "mini miranda" warning at the outset of any interview. Such an approach balances Ethical Rule 4.2 with the real concerns of impropriety due to prior contacts with Defendants' general manager. Defendants' Response is supported by the entire Court record and the following memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. FACTUAL BACKGROUND.

As detailed in Defendants' Motion to Disqualify Peter K. Strojnik and The Strojnik Firm, LLC (collectively "Strojnik") and incorporated as if fully set forth herein, Strojnik embarked in a malicious pre-litigation process designed to harass Defendants through the

threat of criminal prosecution, reporting to governmental agencies, targeted harassment at Defendants' business locations, interference with Defendants' lease, targeting of employees, posting of defamatory statements likening Joseph Popo to a sexual predator, and conducting a smear campaign designed to "destroy these restaurants. See Document 11. Plaintiff's counsel used a variety of mediums to facilitate these objectives, including but not limited to, the creation of a website, dispersal of pamphlets, email correspondence with Defendants' property manager, and postings on websites such as Facebook, LinkedIn, and the Dirty.

Following Defendants' reporting of such conduct to the Arizona State Bar and this Court, Strojnik voluntarily withdrew as counsel, with his father seeking to be substituted as counsel of record. While Strojnik's voluntary withdrawal as counsel of record may have rendered Defendants' Motion to Disqualify moot, the factual background and prior instances of impropriety require that sanctions and limitations on speech be imposed to ensure that substituted counsel, an individual related to Strojnik and sharing the same office space, does not utilize similar efforts to prejudice the litigation process. Additionally, substituted counsel's affirmation of the requested contact with both former and current employees establishes a basic misunderstanding of the ethical boundaries, necessitating that the Court avoid providing Plaintiff and/or Plaintiff's counsel discretion in determining what speech or contact may be permitted by the ethical rules. *See Affirmation from Substituted Counsel*, attached hereto as Exhibit "A."

## II. THE COURT MAY CONSTITUTIONALLY LIMIT SPEECH BEYOND THE CATEGORIES ENUMERATED IN ARIZONA ETHICAL RULE 3.6.

The First Amendment's right of freedom of speech is not absolute, and courts must consider the "special characteristics of the ... environment" in which the speech is uttered. *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733 (1969). In the context of attorney commercial speech, Courts have applied a balancing test that weighs the State's interest in the regulation of a specialized profession in the kind of speech that was at issue. See *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691 (1977); *Peel v. Attorney Registration and Disciplinary Comm'n of Ill.,* 496 U.S. 110 S.Ct.

2281 (1990); *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 98 S.Ct. 1912 (1978); *and Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199 (1984). State and Federal courts have a substantial interest in assuring every person the right to a fair trial, a right which the Supreme Court has described as "the most fundamental of all freedoms." *Estes v. Texas*, 381 U.S. 532, 540, 85 S.Ct. 1628 (1965). Courts have similarly recognized that this right can be impaired by lawyers' unrestrained, prejudicial comments pending trial. *See Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639 (1961). Recognizing these "substantial governmental interests unrelated to the suppression of expression," it is unsurprising that Courts have rendered restrictions on attorney speech constitutional in the litigation context. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991).

In *Gentile*, the United States Supreme Court recognized that whatever right to "free speech" an attorney has is extremely limited and that "on several occasions [we have] approved restriction on the communication of trial participants where necessary to ensure a fair trial." *Id*, 501 U.S. at 1070-1074. In evaluating Nevada Ethical Rule 3.6, the Supreme Court held that the state regulation was narrowly tailored to meet the State's legitimate interests in regulating attorney speech. *Id.*, at 501 U.S. at 1075-1076. Implicitly recognizing that a significant portion of Strojnik's out of court statements violated Arizona Ethical Rule 3.6, which mirrors the Nevada and Model Ethical Rule 3.6, Plaintiff seeks authority to republish the website deleting statements undisputedly in violation of Rule 3.6.

While the Supreme Court's decision in *Gentile* made clear that Ethical Rule 3.6 was a constitutional restraint upon speech, speech otherwise permitted by Ethical Rule 3.6 may still be restrained if narrowly tailored to achieve the objective of a fair trial. As the Supreme Court has aptly stated,

> "we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." See *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507 (1966).

Given counsel's prior abuses and clear motivation to utilize extrajudicial statements as a tool for harassment, prohibiting the maintenance of an internet website is narrowly tailored

to ensure Defendants are afforded a fair trial. While the Court may take palliative measures, such as ensuring that all members of the jury have not visited the website, prejudice is not eliminated as the primary targets of the website are Defendants' customers and employees[1]. With respect to Defendants' employees, such extrajudicial statements have the significant risk of poisoning potential witnesses by exposing them to information that has a high probability of being inadmissible at trial (e.g., hearsay allegations of prior settlements). Similarly, customers are unlikely to have information relevant to the case at issue, underscoring the bad faith intent in targeting this subpopulation.

Even if the Court were to find that a ruling prohibiting the creation of a website is not a narrowly tailored method to avoid prejudice and abuse, the Court has the inherent power to impose sanctions to oversee attorneys practicing before it. *See Thomas v. Tenneco Packaging Corp.*, 293 F.3d 1306, 1308 (11th Cir. 2002) (upholding a district court's decision to sanction an attorney who submitted documents containing personal attacks on opposing counsel); In re Prewitt, 84 Fed.Appx. 397 (2003) (sanction banning attorney from third floor of courthouse did not violate attorney's First Amendment right). Consequently, the prior instances of misconduct relative to the use of the internet justifies a continued prohibition upon use of the same medium in the future.

### III.  COUNSEL HAS NOT DEMONSTRATED THAT THE WEBSITE RESULTED IN THE IDENTIFICATION OF ANY CREDIBLE WITNESSES.

Notwithstanding clear evidence that the website was specifically designed to compel settlement[2], counsel contends that republishing of the website is necessary since it resulted in witnesses coming forward and new witnesses have not been identified since discontinuation of the website. See Doc. 30, page 10. First and foremost, Plaintiff would be able to identify

---

[1] As evidenced by the fliers referencing the prior website being distributed to both the customer and employee parking lots.

[2] Plaintiff voluntarily removed the website during both prior attempts to negotiate a settlement only to immediately republish or seek to republish upon the termination of discussions.

anyone that may have seen the alleged harassment since she presumably would be aware of those present. Secondly, counsel's argument that the website is necessary to identify unknown prior employees is illogical as simply initiating a website is unlikely to draw the attention of former employees unfamiliar with the pending litigation. Such a website is primarily designed to target current employees and customers, or serve as a method for harassment. Perhaps most importantly, counsel's motion identifies only Gena Meier as initiating contact with counsel as a direct result of the website's existence. See Doc. 30, page 11, lines 4-6.

Despite Gena Meier claiming to be a former employee, Defendants have no record or knowledge of Gena Meier having ever being employed. See *Affidavit of Joseph M. Popo*, attached hereto as Exhibit "B." In July of 2014, Gabriella Popo received Facebook messages from an individual identifying herself as Gena Mayor (different spelling) alleging that Joseph Popo was having an affair. Gena Mayor's email alleges the following:

> "Just thought you should know that my friend Amanda has been fucking your husband for a couple of years now…she [Amanda] has screwed me over for the last time and even though I've kept my mouth shut all along, I figured it was time to tell you. She is a conniving lying whore and she's hated by most who know her! Good Luck!!!" *See Facebook Messages*, attached hereto as Exhibit "C."

The vitriolic and vengeful nature of the email, combined with Joseph Popo and Amanda lack of knowledge as to her identity, intimates that the name "Gena Meier" or "Gena Mayor," depending upon the source, is simply a pseudonym for an unidentifiable individual with an axe to grind. The identification of unknown individual(s) seeking to obtain revenge against "Amanda" is not the type of credible evidence the Court should consider in favor of reinitiating a website previously used for improper purposes. Similarly, the claims of having to protect the public are unsupported as Plaintiff's counsel does not provide any witnesses to support such an accusation, but relies entirely upon hearsay allegations communicated to counsel. Plaintiff should not be permitted to rely upon uncorroborated hearsay to support modification of a narrowly tailored restriction on speech to prevent prejudice to the litigation process.

## IV.   NO WITNESS INTIMIDATION HAS OCCURRED.

Plaintiff contention is essentially that republishing of the website is necessary to even playing field as a result of Defendants' alleged intimidation of witnesses. See Document 30. Plaintiff's counsel relies upon a text message from Scott Campillo to Amy Patterson, wherein he attempts to explain why he does not want to become involved in this lawsuit. Contrary to Plaintiff's allegations, Mr. Campillo had not communicated with Defendants' counsel prior to sending the text message, has never witnessed any incidents of harassment, and has not felt intimidated against becoming a witness. *See Affidavit from Scott Campillo*, attached hereto as Exhibit "D." Indeed, had Mr. Campillo known that Plaintiff's counsel would attempt to misconstrue his text message, he would never have sent it, as he does not support Plaintiff's position, nor the tactics undertaken by Plaintiff's counsel. See Exhibit "D."

Similarly, Plaintiff's counsel's allegations that Defendants have intimidated Sheena Gamache are unsupported. Ms. Gamache has not witnessed any of the acts alleged by Ms. Patterson, does not feel intimidated, and does not feel she has anything to offer as a witness in the lawsuit. *See Affidavit from Sheena Gamache*, attached hereto as Exhibit "E." Ms. Gamache explains that the text message was in response to numerous unsolicited communications from Amy Patterson and her counsel seeking her assistance in the lawsuits. See Exhibit "E."

Consequently, the purported text message was merely the attempt of two individuals to avoid being coerced into participating in a lawsuit they believe is improper and which they have no relevant information to provide. Misconstruing their effort to let Ms. Patterson down gently should not be utilized as a basis for permitting improper contacts with current employees or relaxing necessary restrictions on extrajudicial statements.

## V.   COUNSEL HAS NOT INTIMIDATED PLAINTIFF'S COUNSEL.

Plaintiff's counsel's further attempts to minimize the effect of his improper pre-litigation conduct by bringing Defense counsel into disrepute. In support, Plaintiff's counsel contends that Defendants' counsel has threatened multiple bar complaints and sanctions due

to Plaintiff counsel's contact with current and former employees. See Doc. 30, page 8, lines 1-5. To be certain, Defendants' counsel has never threatened the reporting of Plaintiff's counsel to the Arizona State Bar. The pre-litigation conduct was reported to the Arizona State Bar without notice or threat, the matter was screened, and a request for a written submittal was issued. The correspondence provided to the Court was redacted by Plaintiff's counsel to cast Defendants' counsel in a false light. The full text of the correspondence related to the Arizona State Bar complaint was as follows:

> "In an effort to provide full disclosure, Defendants further advise that multiple bar complaints have been filed with the Arizona State Bar, the matter has been screened and the bar has requested additional information in writing. Defendants' counsel have an ethical obligation to participate with such investigation, and therefore, cannot provide a full confidentiality agreement in conjunction with any settlement. Defendants' counsel is amenable to a limited confidentiality agreement prohibiting disclosure of the conduct occurring in this case outside the context of the Arizona State Bar investigation." *See Exhibit* "F."

Clearly, Defendants' counsel was not threatening reporting to the Arizona State Bar as the matter had already been reported. Notification of the pending complaint was provided merely to ensure that any requested confidentiality would have to account for the pending investigation.

Plaintiff's counsel has similarly taken Defendants' notification of their intent to seek sanctions out of context. Plaintiff's counsel refused to cease their ex parte communications with current and former employees, and notification was provided that such conduct would result in a request for sanctions, fees and costs. Sanctions can take a number of forms, including the dismissal of a lawsuit, disqualification of attorneys, monetary fines, etc. Given Plaintiff's counsel's unabashed and intentional contact with current and former employees, Defendants' counsel believes that significant sanctions are warranted in this case to avoid such conduct in the future. The request for sanctions was not intended to "threaten" or "intimidate" counsel, but to ensure compliance with Arizona Ethical Rules.

## VI. PLAINTIFF'S COUNSEL MUST BE RESTRICTED FROM CONTACTING CURRENT AND FORMER EMPLOYEES EX PARTE.

Plaintiff's counsel's motion seeks authorization from this Court to contact both current

and former employees *ex parte*. Pursuant to Arizona Ethical Rule 4.2, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so. Comment 1 clarifies that the blanket prohibition does not prohibit communication with a party, or an employee or agent of a party, concerning matters outside the representation. However, as set forth in Plaintiff's Response to Defendants' Motion to Strike, **Plaintiff contends that all potential violations of law are encompassed within the scope of this litigation** as they may impact Plaintiff's claims for punitive damages. See Doc. 23. Plaintiff's counsel cannot seek to introduce evidence of failures to e-verify, liquor fraud, etc. from his ethical obligation whiles simultaneously trying to place these claims at issue. Prior to bringing these claims within the scope of this litigation, Plaintiff's counsel should have considered that doing so would have prevented him from communicating with current employees relative to such claims.

Where an attorney seeks to communicate with members of an organization, comment 2 establishes that communications by a lawyer concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. While the *Lang v. Superior Court* decision provides examples of circumstances in which *ex parte* communications with former employees are permitted, the Arizona Court of Appeals does not adopt a "per se rule of permitting *ex parte* contacts simply because the individual is a former employee." *Lang v. Superior Court*, 170 Ariz. 602, 608-09, 826 P.2d 1228, 1234-35 (App. 1992) "Such an approach does not comply with the requirements of ER 4.2 of prohibiting *ex parte* contacts with persons whose acts or omissions in connection with the matter may be imputed to the organization." *Id.* Nor does the *Lang v. Superior Court* decision modify the general prohibition against communications with current employees.

Despite Plaintiff's counsel's attempts to limit the scope of employees whose acts or

omissions may be imputed to the organizations so as to expand the pool of potential employees they may communicate with, former employees in managerial positions who may or may not have witnessed discrimination and failed to take action may be imputed to the organizations. Accordingly, Plaintiffs' counsel request for unfettered access to former employees is overbroad and does not comport with the Arizona Ethical Rules. To the extent Plaintiff's Motion seeks authority to contact former employees in managerial positions, Defendants respectfully request that the Motion be denied.

With respect to current employees, employees with managerial or whose acts may be imputed to the organization are prohibited by Rule 4.2, comment 2. The scope of employees falling within the purview of this restriction is exceedingly broad. See e.g., *Orlowski v. Dominick's Finer Foods*, Inc., 937 F.Supp. 723, 728 (N.D.Ill.1996) (holding that hiring, scheduling work shifts, and recommending terminations are managerial responsibilities); *Terra Int'l Inc. v. Mississippi Chemical Corp.*, 913 F.Supp. 1306, 1321 (N.D.Iowa) (holding that supervisor of shipping department who oversaw seven employees was "managerial level" employee); *Berryman v. Consolidated Rail Corp.*, Civ. A. No. 94–3668, 1995 WL 517642, (E.D.Pa. Aug. 28, 1995) (finding, in conclusory manner, that plaintiff's foreman had managerial responsibility)); See also *Hill v. St. Louis Univ.*, 123 F.3d 1114, 1121 (8th Cir.1997) (upholding District Court's ruling that chairman of aerospace technology department at college performed managerial duties). To the extent Plaintiffs seek an order permitting contact with current managers, Defendants respectfully request that such contact be prohibited per ER 4.2, comment 2.

As set forth in the affidavit of Sheena Gamache, she is currently employed as General Manager of Stone and Vine and was contacted directly by Plaintiff's counsel. See Exhibit "E." Once again, while counsel committing the improper *ex parte* conduct has voluntarily withdrawn, mooting a request for disqualification, his father, sharing an office space, has substituted in his place. Consequently, either a blanket prohibition should be instituted to avoid impropriety or reasonable restrictions should be included to ensure counsel does not stray into prohibited areas. In *Brown v. State of Or., Dep't of Corr.*, 173 F.R.D. 265, 267 (D.

Or. 1997) the United States District Court required the following information be provided to each current and former employee at the outset of any contact, and if that person declined to be interviewed, the contact was required to end:

    1)    counsel's representative capacity;

    2)    counsel's reason for seeking the interview;

    3)    the right of current and former employees to refuse to be interviewed; and

    4)    the right of the current or former employees to have his or her counsel present during the ex parte contact.

We believe these "mini miranda" warnings to be a reasonable restriction in light of the prior evidence of improper contacts and respectfully request that any order incorporate such restrictions.

## VII. CONCLUSION

As set forth herein, Defendants respectfully request that the status quo be maintained relative to extrajudicial statements to the public at large and that Plaintiff be prohibited from republishing the website. With respect to *ex parte* communications with witnesses, Defendants are amenable to current and former employees lacking managerial authority being interviewed by Plaintiff's counsel, so long as Plaintiff's counsel provides "mini miranda" warnings at the outset of such communications. As for current and former employees with managerial authority, per Arizona Ethical Rule 4.2, such communications are prohibited and Defendants respectfully request that Plaintiff's request for authority to initiate *ex parte* communications be denied.

///
///
///
///
///
///
///

LEGAL:10453-0075/4476948.1

-11-

RESPECTFULLY SUBMITTED this 11th day of May, 2015.

HYMSON GOLDSTEIN & PANTILIAT, PLLC

By: /s/ Eddie A. Pantiliat *(with permission)*
EDDIE A. PANTILIAT
*Attorneys for Defendants Two Fingers, LLC dba Stone and Vine Urban Italian Restaurant, Four Fingers, LLC dba Salt & Lime Modern Mexican Grill, Six Fingers, LLC dba Black & Bleu Restaurant, and Joseph M. Popo and Gabriella Popo*

WOOD, SMITH, HENNING & BERMAN LLP

By: /s/ Jason R. Mullis
JASON R. MULLIS
*Attorneys for Defendants Two Fingers, LLC dba Stone and Vine Urban Italian Restaurant, Four Fingers, LLC dba Salt & Lime Modern Mexican Grill, Six Fingers, LLC dba Black & Bleu Restaurant, and Joseph M. Popo and Gabriella Popo*

CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of May, 2015, the foregoing document entitled, **DEFENDANTS TWO FINGERS, LLC, FOUR FINGERS, LLC, SIX FINGERS, LLC, AND JOSEPH M. POPO AND GABRIELLA POPO'S RESPONSE TO PLAINTIFF'S MOTION FOR ORDER PROHIBITING DEFENDANTS FROM (1) INTIMIDATING WITNESSES AND (2) THREATENING COUNSEL** was e-filed and served via electronic service through the United States District Court for the District of Arizona's ECF System and to the following ECF registrants:

/ / /

/ / /

| | |
|---|---|
| 1 | Peter Strojnik |
| | STROJNIK, P.C. |
| 2 | Esplanade Center III |
| | 2415 East Camelback Road, Suite 700 |
| 3 | Phoenix, AZ 85016 |

Eddie A. Pantiliat
HYMSON GOLDSTEIN & PANTILIAT, PLLC
16427 N. Scottsdale Road, Suite 300
Scottsdale, Arizona 85254

*Becki Villarreal*
Becki Villarreal

LEGAL:10453-0075/4476948.1

-13-