Eddie A. Pantiliat (State Bar No. 015231)
**HYMSON GOLDSTEIN & PANTILIAT, PLLC**
16427 N. Scottsdale Road, Suite 300
Scottsdale, Arizona 85254
Telephone: 480- 991-9077
minute@legalcounselors.com

*Attorneys for Two Fingers, LLC dba Stone and Vine Urban Italian Restaurant, Four Fingers, LLC dba Salt & Lime Modern Mexican Grill, Six Fingers, LLC dba Black & Bleu Restaurant, and Joseph M. Popo and Gabriella Popo*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

AMY PATTERSON,

Plaintiff,

v.

TWO FINGERS, LLC, an Arizona corporation dba Stone and Vine Urban Italian Restaurant; FOUR FINGERS, LLC, an Arizona corporation dba Salt & Lime Modern Mexican Grill; SIX FINGERS, LLC, an Arizona corporation dba Black & Bleu Restaurant; JOSEPH M. POPO and GABRIELLA POPO,

Defendants.

TWO FINGERS, LLC, an Arizona corporation dba Stone and Vine Urban Italian Restaurant; FOUR FINGERS, LLC, an Arizona corporation dba Salt & Lime Modern Mexican Grill; SIX FINGERS, LLC, an Arizona corporation dba Black & Bleu Restaurant; JOSEPH M. POPO and GABRIELLA POPO,

Counterclaimants,

v.

PETER K. STROJNIK; THE STROJNIK FIRM L.L.C. an Arizona limited liability company; and Doex I – XX,

Case No. 2:15-cv-00494-NVW

**DEFENDANTS/COUNTERCLAIMANTS TWO FINGERS, LLC'S, FOUR FINGERS, LLC'S, SIX FINGERS, LLC'S AND JOSEPH M. POPO AND GABRIELLA POPO'S SECOND AMENDED COUNTERCLAIM**

[Assigned to The Hon. Neil V. Wake]

Counter Defendants.

Defendants/Counterclaimants Joseph M. Popo and Gabriella Popo, Two Fingers, LLC, d/b/a Stone & Vine, Four Fingers, LLC, d/b/a Salt & Lime Modern Mexican Grill, and Six Fingers, LLC d/b/a Black & Bleu (collectively "Plaintiffs"), through undersigned counsel hereby respectfully submit their Counter Complaint against Counter Defendants as follows:

**COUNTERCLAIM AND JURISDICTION**

1. Defendant/Counterclaimant Joseph M. Popo ("Popo") resides in the County of Maricopa, State of Arizona.

2. Defendant/Counterclaimant Two Fingers, LLC, d/b/a Stone & Vine ("Stone & Vine") is an Arizona Limited Liability Company authorized to do business and was doing business within the County of Maricopa, State of Arizona.

3. Defendant/Counterclaimant Four Fingers, LLC, d/b/a Salt & Lime Modern Mexican Grill ("Salt & Lime") is an Arizona Limited Liability Company authorized to do business and was doing business within the County of Maricopa, State of Arizona.

4. Defendants/Counterclaimant Six Fingers, LLC d/b/a Black & Bleu ("Black & Bleu") is an Arizona Limited Liability Company authorized to do business and was doing business within the County of Maricopa, State of Arizona.

5. Counter Defendant Peter Strojnik ("Strojnik") is an attorney licensed to practice law in the State of Arizona and at all relevant times hereto was a resident of the County of Maricopa, State of Arizona.

6. Counter Defendant Strojnik Law Firm, LLC ("Strojnik Firm") is an Arizona Limited Liability Company authorized to do business and was doing business within the County of Maricopa, State of Arizona.

7. Amy Patterson ("Patterson") is an unmarried woman who at all times relevant hereto was a resident of the State of Arizona, Maricopa County.

8. Pursuant to Rule 15(c), Federal Rules of Civil Procedure, Counter Defendants Does I-X are presently unknown persons, partnerships, associations, corporations, and/or

limited liability companies whose true names, identities and status are presently unknown to Counter Claimants and, therefore, Counter Claimants sues said Counter Defendants by such fictitious names. Counter Claimants allege that these fictitiously named Counter Defendants participated in the acts alleged herein or are otherwise liable therefore. When the true names and capacities of said Counter Defendants are ascertained, Counter Claimants will accordingly amend this Complaint as a matter of right or, if required, through leave of Court.

9. All transactions, occurrences and events relevant to this action occurred or originated in Maricopa County, Arizona. Venue is proper in this Court.

## GENERAL ALLEGATIONS

10. On or about January of 2001, Popo developed a restaurant concept focusing upon a unique dining experience and the highest standards of quality and service etiquette.

11. From 2001 through 2011, the numerous restaurants managed and/or operated by Popo increased market share and developed loyal patronage due to Popo's reputation as a superior restaurateur and growing sentiment in the Arizona culinary community.

12. In 2011, Popo initiated development of a new brand focusing upon modern Italian fare known as Stone and Vine. From 2011 to 2015, Stone and Vine continued to grow its customer base and expanded its geographical footprint through the opening of a secondary location, in Chandler, Arizona.

13. In 2013, Due to the successful launch of Stone and Vine, Popo began development of a separate brand providing customers a relaxing environment accompanied by trendy Mexican cuisine and the same level of quality and service Popo's clientele have grown accustomed. In 2014, Salt & Lime opened its doors and has experienced steadily increased sales while attempting to establish itself in the Scottsdale marketplace.

14. In September of 2014, Popo sought to create an additional companion restaurant highlighting the quality of a luxury steakhouse in a more casual modernistic environment, commonly known as Black & Bleu.

15. Patterson was employed as a server, and later manager, by Stone and Vine in 2011, however, Patterson provided services at Salt & Lime and Black & Bleu for a limited time to assist both companies during the launching process.

16. During Patterson's employment, she instigated and actively participated in banter, making explicit sexual references to Popo, such that no reasonable person could perceive Popo's comments in response as harassing or unwelcome.

17. Defendants/Counterclaimants, nor any of its managers, officers, directors or agents, ever engaged in any harassment, discrimination or retaliation against Patterson, and the environment in which Patterson worked was not hostile or offensive as an objective matter and was not considered hostile or offensive by Patterson as a subjective matter.

18. Patterson failed to reasonably make use of Defendants/Counterclaimants' anti-harassment, anti-discrimination and anti-retaliation policies and procedures, as well as the grievance options, mediation options, arbitration options, and other policies and procedures.

19. Patterson failed to complain and/or failed to complain promptly about any alleged retaliation or discrimination.

20. At no point during Patterson's employment did Patterson advise Defendants/Counterclaimants that she was subject to any statements or conduct she deemed harassing or hostile.

21. During the course of Patterson's employment, she routinely voiced her satisfaction with her treatment and role in the company, which included affirmatively inquiring as to the potential of transitioning from a part-time employee to a full-time managerial position.

22. In December of 2014, Patterson, while working at Black & Bleu, was the subject of a complaint posted on Yelp, adversely affecting the image and potential success of the recently opened restaurant. *See Yelp review*, attached hereto as Exhibit "A."

23. The circumstances surrounding the critical Yelp complaint were discussed directly with Patterson, ultimately leading to her resignation.

24. Patterson provided Defendants/Counterclaimants two-weeks notice in conjunction with her resignation, but due to her access to proprietary and financial information, her resignation was accepted effective immediately.

25. Upon notification that her resignation was accepted effective immediately, Patterson inquired as to whether she would nevertheless be paid for an additional two-weeks beyond the termination of her employment. Upon receiving no response from Defendants, Patterson posted on her website "I love being underestimated." *See Screenshot*, attached hereto as Exhibit "B."

26. At not point during discussions with Defendants/Counterclaimants regarding the termination of her employment, did Patterson advise that the reason for her resignation was the result of a hostile work environment or alleged sexual harassment.

27. Patterson, Strojnik and Strojnik Firm conspired with one another to extort money from Popo by threatening the disclosure of work related communications, potential criminal activity, and alleged affairs to the public at large.

28. Upon information and belief, Strojnik and Strojnik Firm, acting as counsel for Patterson, obtained approval and authorization from Patterson prior to engaging in a deliberate and malicious campaign to defame Defendants/Counterclaimants and cause injury and damages to Defendants/Counterclaimants' businesses.

29. Patterson, Strojnik and Strojnik firm embarked on a deliberate and malicious campaign to defame Defendants/Counterclaimants and to injure their businesses, reputations and personal lives.

30. Patterson, Strojnik and Strojnik Firm, unethically, unlawfully and/or tortiously threatened Defendants/Counterclaimants with the disclosure of alleged criminal activity unless Defendants/Counterclaimants paid Patterson, Strojnik and Strojnik Firm.

31. On January 12, 2015, to facilitate the extortion of money from Defendants/Counterclaimants, Patterson, Strojnik and Strojnik Firm threatened an increasing scheme of publicity, inclusive of postings on numerous websites, picketing, disclosure of alleged affairs, pamphlets, reporting to governmental agencies, disclosure to news agencies,

and reporting of alleged criminal activity to the Phoenix Police Department, Department of Homeland Security and Federal Bureau of Investigations. *See correspondence dated January 12, 2015*, attached hereto as Exhibit "C."

32. Upon information and belief, Strojnik and Strojnik Firm obtained authority and approval from Patterson prior to Strojnik and Strojnik Firm issuing correspondence referenced in subparagraph 32.

33. On January 12, 2015, Patterson Strojnik and Strojnik Firm demanded payment in the amount of $500,000 to avoid initiation of the threatened conduct referenced in subparagraph 32, including an agreement not to seek criminal charges against Defendants/Counterclaimants/Third-Party Plaintiffs. *See correspondence dated January 12, 2015*, attached hereto as Exhibit "C."

34. Pursuant to A.R.S. § 13-1804(a), a person commits theft by extortion by knowingly obtaining or seeking to obtain property or services by means of a threat to do in the future any of the following: (5) accuse anyone of a crime or bringing criminal charges against anyone.

35. Upon information and belief, Strojnik's and Strojnik Firm's conduct in this matter violate Arizona Ethics Rules 3.6 ("a lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter), 4.4 (a) (a lawyer shall not use means that have no substantial purpose other than to embarrass, delay or burden any other person), 8.4(c) (prohibition against a lawyer engaging in conduct that is prejudicial to the administration of justice), 8.4(b) (prohibition against a lawyer committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects).

36. In an attempt to demonstrate that Patterson, Strojnik and Strojnik Firm were serious in their threats to bring criminal charges, Patterson, Strojnik and Strojnik Firm disseminated defamatory and libelous information to the public by posting on websites such as

LinkedIn, Facebook and The Dirty Scottsdale, which are accessible to anyone in the public at large. *See Screenshots from Facebook and The Dirty Scottsdale*, attached hereto as Exhibit "D"; and *Screenshots from www.stoneandvinesexallegations.com*, attached hereto as Exhibit "E." The postings on Defendants'/Counterclaimants' Facebook page forced Defendants/Counterclaimants to disable their Facebook account to avoid continued harassment.

a. The allegedly defamatory and/or libelous statements include the following the statement posted on the dirty that "Defendants/Counterclaimants "sexually harassed female employee in dark and disturbing ways and hire undocumented kitchen staff."

b. Counterdefendants' post on The Dirty Scottsdale referred viewers to his/its "website stoneandvinesexallegations for more information." Consequently, all statements made on the website are incorporated into the statements made on The Dirty Scottsdale.

c. The allegedly defamatory and/or libelous statements on the website and/or posted on social media via the website include the following statements:

i. This website is dedicated to ..."relating to her allegations of dark and disturbing sexual harassment and sexual assault by owner Joseph Popo.

ii. That "Joe Popo sexually preyed on her while she was employed there including revealing his bare, shaved penis at work to her, touching her breasts, sexually assaulting her, sending her sexual text messages, and repeatedly asking her to join n a three-way intercourse with another employee."

iii. "This website will keep the public apprised of the progress of Ms. Patterson's legal claims against Popo and Stone and Vine Restaurant and to protect women against predatory male supervisors and bosses."

iv. "In the event we are able to prove the allegations, which is very likely considering the shady sexual history of Mr. Popo has according to witnesses

with whom I have spoken, we will not hesitate to ensure he is punished beyond all comprehension."

v. Patterson alleges that Popo did the following to her: (1) dropped his pants, revealed and touched his penis in front of her, and asked her is she wanted it; (2) sexually assaulted her at the workplace; (3) touched her breasts; (4) attempted to reach under her skirt; (5) rubbed his penis from outside of pants while talking with her; and (6) repeatedly asked her to have sex with him.

vi. Beginning in 2014, her immediate supervisor and owner of the restaurant, Joseph Popp, began to make inappropriate and disturbing sexual advances toward Patterson. It was at this time that Mr. Popo began to take a sexual interest in Ms. Patterson despite the fact that Mr. Popo was married with children. At the time, Mr. Popo was also having an affair with another restaurant employee.

vii. This sexual interest in Ms. Patterson was in the form of demands for sexual intercourse, exposing his penis to Ms. Patterson and asking her if she wanted it, touching her breasts without permission, rubbing his body against her breasts, attempting to reach under her dress or skirt, sexually assaulting her, rubbing his penis from outside his while speaking with her, request that she have a "threesome" with him and another employee…, and send her sexually suggestive text messages, in which some of them would refer to his daughter and her friends and the word "horney" [sic] in the same text message string.

viii. What makes these allegations worse is that the witnesses with whom I have spoken have confirmed two past sexual harassment settlements with Mr. Popo, which shows that Mr. Popo and his restaurants do not learn from past mistakes.

ix. Popo said to Ms. Patterson "I heard you suck pretty good dick."

x. Popo said to Ms. Patterson "your tits are getting smaller."

xi. Popo grabbed Ms. Patterson and forced his tongue down her throat.

xii. Popo repeatedly grabbed Ms. Patterson's breasts.

xiii. Popo repeatedly grabbed Ms. Patterson's butt.

xiv. In numerous conversations between Popo and Ms. Patterson, Popo would rub his penis from the outside of his pants and ask Ms. Patterson to suck it.

xv. On several occasions, Popo would show Ms. Patterson his erect penis through his pants.

xvi. On multiple occasions, Popo would ask Ms. Patterson to make out with …while he watched.

xvii. Popo repeatedly grabbed the waistline of Ms. Patterson's pants and looked inside.

xviii. On multiple occasions, Popo would aggressively pressure Ms. Patterson to have a threesome with him and…

xix. Popo asked Ms. Patterson to describe how she masturbates.

xx. Popo would send Ms. Patterson degrading text messages such as the following: "I'm your boss when you are on your knees I'm grabbing your hair and your cock is throbbing in your mouth.

xxi. Popo would repeatedly tell Ms. Patterson that "I want you to get on your knees."

xxii. Popo repeatedly would attempt to reach his hands underneath Ms. Patterson's skirt.

xxiii. Popo repeatedly would accuse Ms. Patterson of being scared to have an affair with him.

xxiv. Popo demanded sexual intercourse with Ms. Patterson because he "has to go on vacation with my wife."

xxv. On repeated occasions, Popo would grab Ms. Patterson's hips from behind her and thrust his penis against her pelvis repeatedly.

xxvi. Popo revealed his bare penis to Ms. Patterson and demanded sexual relations.

xxvii. In the letter, Pantiliat described Popo as having integrity and honesty even though it is alleged that Popo cheats on his wife, made unwanted and obscene sexual advances toward Patterson.

xxviii. It is alleged that Popo and or the restaurants directly or indirectly defamed Amp Patterson on thedirty.com by calling her a "whore" and accusing her of fhaving and passing sexually transmitted diseases.

xxix. Alleged Predator Owner Joe Popo, married with children.

xxx. Joe Popo. Does he look like a sexual predator to you?

xxxi. ****New Development**** Amy Patterson, who has sued the degenerate Joe Popo and Stone and Vine for sexual assault and defamation, has now been sued by them in a counterclaim...This behavior is not atypical against a victim after the suspect has been caught in the sexual harassment. Sexual harassers and predators often attempt to characterize the victim as the wrongdoer

xxxii. Ms. Patterson alleges there were none when she worked there even though it was allegedly generally known that Popo had a history of sexual harassment and infidelity at the workplace.

xxxiii. Please spread the word about the allegations against Joe Popo and Stone and Vine Restaurant. The allegations against Mr. Popo include sexual assault of the most depraved type.

xxxiv. Do you support a restaurant that has an owner Joe Popo alleged to sexually assault and sexually harass former employee Amy Patterson.

37. Upon information and belief, Strojnik and Strojnik Firm would not have taken the actions outlined in subparagraph 37 without the express approval and consent of Patterson.

38. Strojnik and Strojnik Firm knew their defamatory and libelous statements on The Dirty Scottsdale would be viewed by the public at large and injure Defendants/Counterclaimants.

39. In an further attempt to extort money, Patterson, Strojnik and Strojnik Firm created a website designed solely to disseminate information to the public, disparage

Defendants/Counterclaimants/Third-Party Plaintiffs (and their attorney), and extort Defendants/Counterclaimants/Third-Party Plaintiffs into paying money to avoid further publicity and/or the reporting of alleged criminal activity. *See Screenshots from www.stoneandvinesexallegations.com*, attached hereto as Exhibit "E."

40. Via the website www.stoneandvinesexallegations.com and correspondence with counsel, Patterson, Strojnik and Strojnik Firm made clear that their motives were to "destroy these restaurants," "ensure he [Popo] is punished beyond all comprehension," and "ensure that Mr. Popo and his restaurants are punished mercilessly in a court of law." *See Screenshots from www.stoneandvinesexallegations.com*, attached hereto as Exhibit "E"; and Email correspondence with counsel, attached hereto as Exhibit "F."

41. Upon information and belief, Strojnik and the Strojnik Firm would not have taken the actions outlined in subparagraphs 40 and 41 without the express approval and/or consent of Patterson.

42. Patterson, Strojnik, Strojnik Firm and/or their paid representatives visited Defendants/Counterclaimants' places of business on numerous occasions to protest, disseminate pamphlets and/or otherwise bully Defendants/Counterclaimants into capitulating to their unlawful demands. *See Pamphlet*, attached hereto as Exhibit "G"; and *email from Strojnik*, attached hereto as Exhibit "H."

43. Patterson, Strojnik and Strojnik Firm further attempted to extort, coerce and/or bully Defendants/Counterclaimants by interfering with the contractual relationship between Defendants/Counterclaimants' and their Property Managers, stating "our beef is with SV and this sick man Popo not your client," "I don't really see any negative impact to 9400 considering that's some prime real estate that can be re-filled with another lessee quite quickly," and "I am very sure 9400 would be much more concerned about leasing to a company that is alleged to be violating federal immigration laws verse some little 'ole fliers, and that your client certainly does not wish to aid or abet such activity." *See email from Strojnik*, attached hereto as Exhibit "H."

44. 94 Hundred Shea, LLLP ("94 Hundred Shea"), the owner of the property where Defendants'/Counterclaimants' principle places of business are located, issued a Cease and Desist letter to Strojnik arising out of the targeted campaign, advising that continued conduct would be considered trespassing and deemed tortious interference with the contractual relationships 94 Hundred Shea maintained with its tenants. *See Cease and Desist Letter*, attached hereto as Exhibit "I."

45. On January 30, 2015, Defendants/Counterclaimants sent correspondence to Patterson, Strojnik and Strojnik Firm advising of their position relative to the alleged charges. *See January 30, 2015 correspondence*, attached hereto as Exhibit "J."

46. On February 1, 2015, in direct response to Defendants/Counterclaimants' correspondence advising that they would not fall prey to their extortionist tactics, Patterson, Strojnik and Strojnik Firm increased their demand and threatened to escalate hostilities, stating:

> "as we speak, my creative is working on the artwork for the standard-sized "Shame On" banner that will be placed in a public area in front of Stone and Vine once this week during happy hour times. The next week, it will be placed there two days. The following week, three days. And so on. And when it becomes every day, I will ask my creative to print a new banner for Salt & Lime. And so on, and so on. You will be surprised at how inexpensive this is and how experienced I am at this." *See Correspondence dated February 1, 2015*, attached hereto as Exhibit "L."

47. Defendants/Counterclaimants requested that Patterson, Strojnik and Strojnik Firm cease and desist, but Strojnik and Strojnik Firm have failed to do so.

48. Strojnik's and Strojnik Firm's statements referenced above are false, in that they may be conclusively established with evidence to be untrue.

49. Strojnik's and Strojnik Firm's statements are false in that they cite cherry-picked statements that are taken out of context and include statements from unproven and untrue allegations of unverified complaints against Defendants that are presented out of context and combined with false statements and innuendos of Patterson's, Strojnik's and Strojnik Firm's own fabrication that, when considered as a whole, result in false statements being conveyed to the readers by implying meanings that are untrue. Patterson, Strojnik and Strojnik Firm

purposefully misconstrued and manipulated information to convey the most damaging possible image of Defendants.

50. As a direct and proximate result of the conduct alleged in subparagraphs 28 through 50, Defendants/Counterclaimants suffered extreme emotional distress, damage to reputation, embarrassment, loss of goodwill, loss of revenue, loss of income, damages to contractual interests, incurred fees and costs seeking to enjoin such conduct and damage to ongoing business concerns.

**COUNT ONE**
**(INJURIOUS FALSEHOOD – BUSINESS DISPARAGEMENT TO PERSUADE OTHERS FROM DEALING WITH COUNTERCLAIMANTS AGAINST COUNTER-DEFENDANT STROJNIK AND STROJNIK FIRM)**

51. Defendants/Counterclaimants reiterate each of the above allegations as if set forth in full.

52. Strojnik, and Strojnik Firm published or caused to be published false, derogatory statements to third parties relating to Defendants/Counterclaimants' business and professional abilities, causing Defendants/Counterclaimants to suffer monetary damages.

53. Such statements may reasonably be interpreted as concerning Defendants/Counterclaimants and leave no doubt that the statements were intended to harm the reputation and image of Defendants/Counterclaimants by alleging criminal activity, and make statements intending to "destroy these restaurants." Such statements were calculated to prevent others from dealing with Defendants/Counterclaimants, disparage their reputations, cause clients to shun the businesses, adversely impact relationships with landlords and/or property managers, and/or otherwise expose those involved to ridicule and/or contempt.

54. Strojnik and Strojnik Firm further attempted to extort, coerce and/or bully Defendants/Counterclaimants by interfering with the contractual relationship between Defendants/Counterclaimants and their Property Managers, stating "our beef is with SV and this sick man Popo not your client," "I don't really see any negative impact to 9400 considering that's some prime real estate that can be re-filled with another lessee quite

quickly," and "I am very sure 9400 would be much more concerned about leasing to a company that is alleged to be violating federal immigration laws verse some little 'ole fliers, and that your client certainly does not wish to aid or abet such activity." *See email from Strojnik*, attached hereto as Exhibit "H."

55. 94 Hundred Shea, LLLP ("94 Hundred Shea"), the owner of the property where Defendants'/Counterclaimants' principle places of business are located, issued a Cease and Desist letter to Strojnik arising out of the targeted campaign, advising that continued conduct would be considered trespassing and deemed tortious interference with the contractual relationships 94 Hundred Shea maintained with its tenants. *See Cease and Desist Letter*, attached hereto as Exhibit "I."

56. Such statements included, but are not limited to, statements made by Patterson, Strojnik, and Strojnik Firm on various websites, via pamphlet, and picketers.

57. The statements authored by Strojnik, and Strojnik Firm were reasonably understood by those who heard them to cast doubt on the quality of Defendants/Counterclaimants' business and have adversely impacted Defendants'/Counterclaimants' relationship with their landlord.

58. Such statements are demonstrably false in that they include untrue statements, purposefully include unverified complaints, presented facts out of context and included false innuendos, when considered as a whole, conveyed false meanings to the readers or implied meanings that are untrue.

59. At the time such statements were published, Strojnik, and Strojnik Firm knew the statements were false, or recklessly disregarded for their falsity, and acted with actual malice "to destroy these restaurants," "ensure he is punished beyond all comprehension" and "ensure that Mr. Popo and his restaurants are punished mercilessly in a court of law." Patterson, Strojnik, and Strojnik Firm have admitted that they acted with actual malice by identifying their intent in disseminating was to harm and injure the reputations of Defendants/Counterclaimants in the eye of the consumers and landlord, with the fabricated pretense of providing a public service by informing the general public.

60. Strojnik's, and Strojnik Firm's publication of false and defamatory statements did, in fact, directly and proximately result in harm to Defendants/Counterclaimants' business, trade, profession, occupation, resulting in severe and extreme emotional distress, contracts, reputation impairment, impairment of community standing or future standing, humiliation, inconvenience, loss of income and damage to Defendants/Counterclaimants' ongoing business concerns.

61. As a direct and proximate consequence of such libel alleged herein, Defendants/Counterclaimants have been generally, specifically and consequentially damages in an amount to be established at trial.

62. The aforementioned statements were disseminated wilfully and intentionally with malice, entitling Defendants/Counterclaimants to exemplary and/or punitive damages in an amount to be established at trial to dissuade Strojnik, and Strojnik Firm and/or otherwise deter such conduct in the future. Punitive damages are further appropriate due to Strojnik's, and Strojnik Firm's violation of the ethical rules of conduct and pattern of oppressive and harassing conduct. See Arizona Ethical Rules 3.6, 4.4 (a), 8.4(c), and 8.4(b)

WHEREFORE, Defendants/Counterclaimants request that judgment be entered against Strojnik, and Strojnik Firm as follows:

A. For compensatory damages in an amount according to proof at trial;

B. For punitive damages in an amount according to proof at trial;

C. For the issuance of a permanent injunction enjoining Patterson, Strojnik, and Strojnik Firm from republishing any of their false and defamatory statements about Defendants/Counterclaimants, either orally, via the internet, via hand-delivery, electronically, and/or in print;

D. For cost of suit incurred herein, including but not limited to, attorneys' fees, costs and expert witness fees; and

E. For such other and further relief as the Court deems just and proper.

**COUNT TWO**
**(WRONGFUL INTERFERENCE WITH BUSINESS RELATIONSHIPS AGAINST COUNTER-DEFENDANTS STROJNIK AND STROJNIK FIRM)**

63. Defendants/Counterclaimants reiterate each of the above allegations as if set forth in full.

64. Defendants/Counterclaimants had prospective and actual contracts with vendors, regular business expectancy interests with members of the public at large, clients and potential business expectancy interests.

65. Defendants/Counterclaimants knew about the existence of these contractual relationships and business expectancy interests, as demonstrated by the statements made by Strojnik, and Strojnik Firm to adversely impact such contracts and business expectancy interests by "destroy[ing] these restaurants."

66. Strojnik's, and Strojnik Firm's conduct was improper.

67. Such statements may reasonably be interpreted as concerning Defendants/Counterclaimants and leave no doubt that the statements were intended to harm the reputation and image of Defendants/Counterclaimants by alleging criminal activity, and make statements intending to "destroy these restaurants." Such statements were calculated to prevent others from dealing with Defendants/Counterclaimants, disparage their reputations, cause clients to shun the businesses, adversely impact relationships with landlords, clients and/or property managers, and/or otherwise expose those involved to ridicule and/or contempt.

68. Strojnik and Strojnik Firm further attempted to extort, coerce and/or bully Defendants/Counterclaimants by interfering with the contractual relationship between Defendants/Counterclaimants and their Property Managers, stating "our beef is with SV and this sick man Popo not your client," "I don't really see any negative impact to 9400 considering that's some prime real estate that can be re-filled with another lessee quite quickly," and "I am very sure 9400 would be much more concerned about leasing to a company that is alleged to be violating federal immigration laws verse some little 'ole fliers,

and that your client certainly does not wish to aid or abet such activity." *See email from Strojnik*, attached hereto as Exhibit "H."

69. 94 Hundred Shea, LLLP ("94 Hundred Shea"), the owner of the property where Defendants'/Counterclaimants' principle places of business are located, issued a Cease and Desist letter to Strojnik arising out of the targeted campaign, advising that continued conduct would be considered trespassing and deemed tortious interference with the contractual relationships 94 Hundred Shea maintained with its tenants. *See Cease and Desist Letter*, attached hereto as Exhibit "I."

70. The statements authored by Strojnik, and Strojnik Firm were reasonably understood by those who heard the to cast doubt on the quality of Defendants/Counterclaimants' services, injure relationships with their landlords and property managers, damaging relationships with current clients, affecting future business relationships with expected clients, and interfering and/or inducing others to breach their relationship or expectancy interest.

71. Such statements are demonstrably false in that they include untrue statements, purposefully include unverified complaints, presented facts out of context and included false innuendos, when considered as a whole, conveyed false meanings to the readers or implied meanings that are untrue.

72. Strojnik's, and Strojnik Firm's publication of false and defamatory statements did, in fact, directly and proximately result in harm to Defendants/Counterclaimants' business, contracts, trade, profession, occupation, resulting in severe and extreme emotional distress, reputation impairment, impairment of community standing or future standing, humiliation, inconvenience, potential loss of business locations, loss of income and damage to Defendants/Counterclaimants' ongoing business concerns.

73. As a direct and proximate consequence of such statements alleged herein, Defendants/Counterclaimants have been generally, specifically and consequentially damages in an amount to be established at trial.

74. The aforementioned statements were disseminated wilfully and intentionally with malice, entitling Defendants/Counterclaimants to exemplary and/or punitive damages in an amount to be established at trial to dissuade Strojnik, and Strojnik Firm and/or otherwise deter such conduct in the future. Punitive damages are further appropriate due to Strojnik's, and Strojnik Firm's violation of the ethical rules of conduct and pattern of oppressive and harassing conduct. See Arizona Ethical Rules 3.6, 4.4 (a), 8.4(c), and 8.4(b)

WHEREFORE, Defendants/Counterclaimants request that judgment be entered against Strojnik and Strojnik Firm as follows:

A. For compensatory damages in an amount according to proof at trial;

B. For punitive damages in an amount according to proof at trial;

C. For the issuance of a permanent injunction enjoining Strojnik, and Strojnik Firm from republishing any of their false and defamatory statements about Defendants/Counterclaimants, either orally, via the internet, via hand-delivery, electronically, and/or in print;

D. For cost of suit incurred herein, including but not limited to, attorneys' fees, costs and expert witness fees; and

E. For such other and further relief as the Court deems just and proper.

**COUNT THREE**
**(DEFAMATION (LIBEL PER SE) AGAINST COUNTER-DEFENDANTS STROJNIK AND STROJNIK FIRM)**

75. Defendants/Counterclaimants reiterate each of the above allegations as if set forth in full.

76. The statements alleged hereinabove were published within one-year to the public at large, and anyone in the public at large using the internet and/or receiving the pamphlets were/are able to discover them.

77. Such statements may reasonably be interpreted as concerning Defendants/Counterclaimants and leave no doubt that the statements were intended to harm the reputation and image of Defendants/Counterclaimants by alleging criminal activity, and

make statements intending to "destroy these restaurants," "ensure he is punished beyond all comprehension" and "ensure that Mr. Popo and his restaurants are punished mercilessly in a court of law."

78. Such statements tend to affect Defendants/Counterclaimants' reputation, causing clients to shun the businesses, adversely impact relationships with landlords and/or property managers, adversely affecting current and potential clients, and otherwise exposing those involved to ridicule and/or contempt.

79. Such statements are demonstrably false in that they include untrue statements, purposefully include unverified complaints, presented facts out of context and included false innuendos, when considered as a whole, conveyed false meanings to the readers or implied meanings that are untrue.

80. At the time such statements were published, Strojnik, and Strojnik Firm knew the statements were false, or recklessly disregarded for their falsity, and acted with actual malice "to destroy these restaurants," "ensure he is punished beyond all comprehension" and "ensure that Mr. Popo and his restaurants are punished mercilessly in a court of law." Patterson, Strojnik, and Strojnik Firm have admitted that they acted with actual malice by identifying their intent in disseminating was to harm and injure the reputations of Defendants/Counterclaimants in the eye of the consumers, with the fabricated pretense of providing a public service by informing the general public.

81. Strojnik's, and Strojnik Firm's publication of false and defamatory statements did, in fact, directly and proximately result in harm to Defendants/Counterclaimants' business, trade, contracts, profession, occupation, resulting in severe and extreme emotional distress, reputation impairment, impairment of community standing or future standing, humiliation, inconvenience, loss of income and damage to Defendants/Counterclaimants' ongoing business concerns.

82. Such statements bring Defendants/Counterclaimants into disrepute, contempt, ridicule, and/or impeach Defendants/Counterclaimants' honesty, integrity, virtue and reputation.

83. Strojnik and Strojnik Firm further attempted to extort, coerce and/or bully Defendants/Counterclaimants by interfering with the contractual relationship between Defendants/Counterclaimants' and their Property Managers, stating "our beef is with SV and this sick man Popo not your client," "I don't really see any negative impact to 9400 considering that's some prime real estate that can be re-filled with another lessee quite quickly," and "I am very sure 9400 would be much more concerned about leasing to a company that is alleged to be violating federal immigration laws verse some little 'ole fliers, and that your client certainly does not wish to aid or abet such activity." *See email from Strojnik*, attached hereto as Exhibit "H."

84. 94 Hundred Shea, LLLP ("94 Hundred Shea"), the owner of the property where Defendants'/Counterclaimants' principle places of business are located, issued a Cease and Desist letter to Strojnik arising out of the targeted campaign, advising that continued conduct would be considered trespassing and deemed tortious interference with the contractual relationships 94 Hundred Shea maintained with its tenants. *See Cease and Desist Letter*, attached hereto as Exhibit "I."

85. As a direct and proximate consequence of such libel per se alleged herein, Defendants/Counterclaimants have been generally, specifically and consequentially damages in an amount to be established at trial.

86. The aforementioned libel per se was committed wilfully and intentionally with malice, entitling Defendants/Counterclaimants to exemplary and/or punitive damages in an amount to be established at trial to dissuade Strojnik, and Strojnik Firm and/or otherwise deter such conduct in the future. Punitive damages are further appropriate due to Strojnik's, and Strojnik Firm's violation of the ethical rules of conduct and pattern of oppressive and harassing conduct. See Arizona Ethical Rules 3.6, 4.4 (a), 8.4(c), and 8.4(b)

87. Strojnik's, and Strojnik Firm's libel per se, unless enjoined by a preliminary injunction and a permanent injunction judgment of this Court, will continue to cause great and irreparable injury to Defendants/Counterclaimants. No adequate remedy at law exist for the

injuries that are currently being suffered and are threated to be suffered by Strojnik, and Strojnik Firm.

WHEREFORE, Defendants/Counterclaimants request that judgment be entered against Strojnik, and Strojnik Firm as follows:

A. For compensatory damages in an amount according to proof at trial;

B. For punitive damages in an amount according to proof at trial;

C. For the issuance of a permanent injunction enjoining Strojnik, and Strojnik Firm from republishing any of their false and defamatory statements about Defendants/Counterclaimants, either orally, via the internet, via hand-delivery, electronically, and/or in print;

D. For cost of suit incurred herein, including but not limited to, attorneys' fees, costs and expert witness fees; and

E. For such other and further relief as the Court deems just and proper.

**COUNT FOUR**
**(DEFAMATION (TRADE LIBEL) DISPARAGEMENT OF THE QUALITY OF BUSINESS AGAINST COUNTER-DEFENDANTS PATTERSON, STROJNIK AND STROJNIK FIRM)**

88. Defendants/Counterclaimants reiterate each of the above allegations as if set forth in full.

89. Defendants/Counterclaimants' integrity, competence and quality of service and/or business are legally protectable interests that are subject to trade libel.

90. Such statements may reasonably be interpreted as concerning Defendants/Counterclaimants and leave no doubt that the statements were intended to harm the reputation and image of Defendants/Counterclaimants' business by alleging criminal activity, and make statements intending to "destroy these restaurants." Such statements were calculated to prevent others from dealing with Defendants/Counterclaimant, disparage their reputations, cause clients to shun the businesses, and/or otherwise expose those involved to ridicule and/or contempt.

91. Within one-year of the filing of the herein action, Strojnik, and Strojnik Firm disparaged Defendants/Counterclaimants through public statements intending to disparage Defendants/Counterclaimants' integrity, contractual relationships, competence and quality of service.

92. Such statements are demonstrably false in that they include untrue statements, purposefully include unverified complaints, presented facts out of context and included false innuendos, when considered as a whole, conveyed false meanings to the readers or implied meanings that are untrue.

93. At the time such statements were published, Strojnik, and Strojnik Firm knew the statements were false, or recklessly disregarded for their falsity, and acted with actual malice "to destroy these restaurants," ensure he is punished beyond all comprehension" and "ensure that Mr. Popo and his restaurants are punished mercilessly in a court of law." Patterson, Strojnik, and Strojnik Firm have admitted that they acted with actual malice by identifying their intent in disseminating was to harm and injure the reputations of Defendants/Counterclaimants in the eye of the consumers, with the fabricated pretense of providing a public service by informing the general public.

94. Strojnik and Strojnik Firm further attempted to extort, coerce and/or bully Defendants/Counterclaimants by interfering with the contractual relationship between Defendants/Counterclaimants and their Property Managers, stating "our beef is with SV and this sick man Popo not your client," "I don't really see any negative impact to 9400 considering that's some prime real estate that can be re-filled with another lessee quite quickly," and "I am very sure 9400 would be much more concerned about leasing to a company that is alleged to be violating federal immigration laws verse some little 'ole fliers, and that your client certainly does not wish to aid or abet such activity." *See email from Strojnik*, attached hereto as Exhibit "H."

95. 94 Hundred Shea, LLLP ("94 Hundred Shea"), the owner of the property where Defendants'/Counterclaimants'/Third-Party Plaintiffs' principle places of business are located, issued a Cease and Desist letter to Strojnik arising out of the targeted campaign, advising that

continued conduct would be considered trespassing and deemed tortious interference with the contractual relationships 94 Hundred Shea maintained with its tenants. *See Cease and Desist Letter*, attached hereto as Exhibit "I."

96. Strojnik's, and Strojnik Firm's publication of false and defamatory statements did, in fact, directly and proximately result in harm to Defendants/Counterclaimants' business, trade, profession, occupation, resulting in severe and extreme emotional distress, reputation impairment, impairment of community standing or future standing, humiliation, inconvenience, loss of income, adversely impact relationships with landlords and/or property managers, and damage to Defendants/Counterclaimants' ongoing business concerns.

97. As a direct and proximate consequence of such libel alleged herein, Defendants/Counterclaimants have been generally, specifically and consequentially damages in an amount to be established at trial.

98. The aforementioned libel was committed wilfully and intentionally with malice, entitling Defendants/Counterclaimants/Third-Party Plaintiffs to exemplary and/or punitive damages in an amount to be established at trial to dissuade Strojnik, and Strojnik Firm and/or otherwise deter such conduct in the future. Punitive damages are further appropriate due to Strojnik's, and Strojnik Firm's violation of the ethical rules of conduct and pattern of oppressive and harassing conduct. See Arizona Ethical Rules 3.6, 4.4 (a), 8.4(c), and 8.4(b)

99. Strojnik's, and Strojnik Firm's libel, unless enjoined by a preliminary injunction and a permanent injunction judgment of this Court, will continue to cause great and irreparable injury to Defendants/Counterclaimants. No adequate remedy at law exist for the injuries that are currently being suffered and are threated to be suffered by Patterson, Strojnik, and Strojnik Firm.

WHEREFORE, Defendants/Counterclaimants request that judgment be entered against Strojnik, and Strojnik Firm as follows:

A. For compensatory damages in an amount according to proof at trial;

B. For punitive damages in an amount according to proof at trial;

C. For the issuance of a permanent injunction enjoining Strojnik, and Strojnik Firm

from republishing any of their false and defamatory statements about Defendants/Counterclaimants, either orally, via the internet, via hand-delivery, electronically, and/or in print;

D. For cost of suit incurred herein, including but not limited to, attorneys' fees, costs and expert witness fees; and

E. For such other and further relief as the Court deems just and proper.

**COUNT FIVE**
**(INVASION OF PRIVACY (PRIVATE AFFAIRS) AGAINST COUNTER-DEFENDANTS STROJNIK AND STROJNIK FIRM)**

100. Defendants/Counterclaimants reiterate each of the above allegations as if set forth in full.

101. As alleged herein, Strojnik, and Strojnik Firm disseminated numerous statements on the internet, via pamphlet and through the use of picketers within one year of the filing of this action.

102. Strojnik, and Strojnik Firm gave publicity to such statements through the public disclosure such that anyone in the public at large will be able to discover them.

103. Such statements were private matters, inclusive of intimate details of Popo's private life that are not generally known, which are provided the highest privacy interests. Such private matters have not been publicly disclosed and/or are demonstrably false in that they include untrue statements, purposefully include unverified complaints, presented facts out of context and included false innuendos, when considered as a whole, conveyed false meanings to the readers or implied meanings that are untrue.

104. Such statements were highly offensive to Popo himself, but a reasonable person of ordinary sensibilities would also have found them to be highly offensive.

105. Such statements were private matters not a of legitimate public concern.

106. Strojnik, and Strojnik Firm published private facts with a reckless disregard for the fact that reasonable persons would find the invasion highly offensive.

107. As a direct and proximate consequence of such libel alleged herein, Defendants/Counterclaimants have been generally, specifically and consequentially damages in an amount to be established at trial.

108. The aforementioned disclosure of private facts was committed wilfully and intentionally with malice, entitling Defendants/Counterclaimants to exemplary and/or punitive damages in an amount to be established at trial to dissuade Strojnik, and Strojnik Firm and/or otherwise deter such conduct in the future. Punitive damages are further appropriate due to Strojnik's, and Strojnik Firm's violation of the ethical rules of conduct and pattern of oppressive and harassing conduct. See Arizona Ethical Rules 3.6, 4.4 (a), 8.4(c), and 8.4(b)

109. Strojnik's, and Strojnik Firm's disclosure of private facts, unless enjoined by a preliminary injunction and a permanent injunction judgment of this Court, will continue to cause great and irreparable injury to Defendants/Counterclaimants. No adequate remedy at law exist for the injuries that are currently being suffered and are threated to be suffered by Strojnik, and Strojnik Firm.

WHEREFORE, Defendants/Counterclaimants request that judgment be entered against Strojnik, and Strojnik Firm as follows:

A. For compensatory damages in an amount according to proof at trial;

B. For punitive damages in an amount according to proof at trial;

C. For the issuance of a permanent injunction enjoining Strojnik, and Strojnik Firm from disseminating private facts about Defendants/Counterclaimants, either orally, via the internet, via hand-delivery, electronically, and/or in print;

D. For cost of suit incurred herein, including but not limited to, attorneys' fees, costs and expert witness fees; and

E. For such other and further relief as the Court deems just and proper.

**COUNT SIX**
**(INVASION OF PRIVACY -FALSE LIGHT – COUNTER-DEFENDANTS STROJNIK AND STROJNIK FIRM)**

110. Defendants/Counterclaimants reiterate each of the above allegations as if set forth in full.

111. Defendants/Counterclaimants were placed in a false light before the public due to Patterson's, Strojnik's and Strojnik Firm's authoring, creating and publishing statements to third-parties via media, print and word of mouth.

112. The false light in which Defendants/Counterclaimants have been placed is highly offensive to a reasonable person.

113. Strojnik, and Strojnik Firm knew the statements were false, acted in a disregard of the truth and/or despite the falsity of the statement with knowledge of the implications such statements would have on Defendants/Counterclaimants.

114. Defendants/Counterclaimants have suffered damage to their reputations and businesses as result of Patterson's, Strojnik's and Strojnik Firm's conduct.

115. The statements separately or in conjunction with one another were published by Strojnik, and Strojnik Firm by reason of evil motive and/or malice toward Defendants/Counterclaimants and were intended and/or designed to cast Defendants/Counterclaimants in a false light.

116. The statements were false.

117. Strojnik's and Strojnik Firm's statements referenced above are false, in that they may be conclusively established with evidence to be untrue.

118. Strojnik's and Strojnik Firm's statements are false in that they cite cherry-picked statements that are taken out of context and include statements from unproven and untrue allegations of unverified complaints against Defendants that are presented out of context and combined with false statements and innuendos of Strojnik's and Strojnik Firm's own fabrication that, when considered as a whole, result in false statements being conveyed to the readers by implying meanings that are untrue. Strojnik and Strojnik Firm purposefully

misconstrued and manipulated information to convey the most damaging possible image of Defendants/Counterclaimants.

119. Punitive damages are appropriate as a result of Strojnik's, and Strojnik Firm's evil motive.

WHEREFORE, Defendants/Counterclaimants request that judgment be entered against Strojnik, and Strojnik Firm as follows:

A. For compensatory damages in an amount according to proof at trial;

B. For punitive damages in an amount according to proof at trial;

C. For the issuance of a permanent injunction enjoining Strojnik, and Strojnik Firm from republishing any of their false and defamatory statements about Defendants/Counterclaimants, either orally, via the internet, via hand-delivery, electronically, and/or in print;

D. For cost of suit incurred herein, including but not limited to, attorneys' fees, costs and expert witness fees; and

E. For such other and further relief as the Court deems just and proper.

**COUNT SEVEN**
**(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS) AGAINST COUNTER-DEFENDANTS STROJNIK AND STROJNIK FIRM)**

120. Defendants/Counterclaimants reiterate each of the above allegations as if set forth in full.

121. Strojnik's, and Strojnik Firm's extreme and outrageous conduct, as alleged herein, includes but is not limited to, harassment, extortion, defamation, and invasion of privacy, were intentionally and maliciously committed with the intent to humiliate Defendants/Counterclaimants, inflict severe mental anguish, and emotional and physical distress, and was done in a wanton and reckless disregard of the consequences to Defendants/Counterclaimants.

122. Strojnik, and Strojnik Firm intended to inflict severe mental anguish and emotional distress by disseminating statements that were false in that they include untrue

statements, purposefully include unverified complaints, presented facts out of context and included false innuendos, when considered as a whole, conveyed false meanings to the readers or implied meanings that are untrue.

123. As a direct and proximate result of such extreme and outrageous conduct, Defendants/Counterclaimants did in fact suffer sever humiliation, severe mental anguish, and severe emotional stress, and will continue to suffer mental suffering if the outrageous conduct is permitted to continue.

124. As a result of such severe and extreme emotional distress, Defendants/Counterclaimants have been generally, specifically and consequentially damaged in an amount to be established at trial.

125. The aforementioned infliction of extreme emotional distress was committed wilfully and intentionally with malice, entitling Defendants/Counterclaimants to exemplary and/or punitive damages in an amount to be established at trial to dissuade Strojnik, and Strojnik Firm and/or otherwise deter such conduct in the future. Punitive damages are further appropriate due to Strojnik's, and Strojnik Firm's violation of the ethical rules of conduct and pattern of oppressive and harassing conduct. See Arizona Ethical Rules 3.6, 4.4 (a), 8.4(c), and 8.4(b)

WHEREFORE, Defendants/Counterclaimants request that judgment be entered against Strojnik, and Strojnik Firm as follows:

A. For compensatory damages in an amount according to proof at trial;

B. For punitive damages in an amount according to proof at trial;

C. For cost of suit incurred herein, including but not limited to, attorneys' fees, costs and expert witness fees; and

D. For such other and further relief as the Court deems just and proper.

**VERIFICATION**

The undersigned affirms under penalties of perjury that the contents of the foregoing Counter-Complaint are true to the best of my knowledge, information and belief.

RESPECTFULLY SUBMITTED this 10th day of June, 2015.

HYMSON GOLDSTEIN & PANTILIAT, PLLC

By: [signature] w/authorization
EDDIE A. PANTILIAT
*Attorneys for Defendants Two Fingers, LLC dba Stone and Vine Urban Italian Restaurant, Four Fingers, LLC dba Salt & Lime Modern Mexican Grill, Six Fingers, LLC dba Black & Bleu Restaurant, and Joseph M. Popo and Gabriella Popo*

---

CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of June, 2015, the foregoing document entitled, **DEFENDANTS/COUNTERCLAIMANTS TWO FINGERS, LLC'S, FOUR FINGERS, LLC'S, SIX FINGERS, LLC'S AND JOSEPH M. POPO AND GABRIELLA POPO'S SECOND AMENDED COUNTERCLAIM** was e-filed and served via electronic service through the United States District Court for the District of Arizona's ECF System and to the following ECF registrants:

Peter K. Strojnik
THE STROJNIK FIRM L.L.C.
Esplanade Center III, Suite 700
2415 East Camelback Road
Phoenix, AZ 85016

Peter Strojnik
Strojnik, P.C.
2415 E. Camelback Road, Suite 700
Phoenix, AZ 85016

By: [signature]
Susan Montalvo